# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ROBERT A. KESTNER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00016 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I.  Background and Standard of Review*

Plaintiff, Robert A. Kestner, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq*.  (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Kestner protectively filed his applications for DIB and SSI on December 15, 2006, alleging disability as of December 31, 2003, due to back and left leg pain due to a pinched nerve in the lower back, as well as shoulder pain status-post rotator cuff surgery. (Record, ("R."), at 100-08, 113, 123, 127, 135.) The claims were denied initially and on reconsideration. (R. at 60-62, 66, 69-70, 72-74.) Kestner then requested a hearing before an administrative law judge, ("ALJ"). (R. at 76.) The hearing was held on October 6, 2008, at which Kestner was represented by counsel. (R. at 29-55.)

By decision dated February 6, 2009, the ALJ denied Kestner's claims. (R. at 11-26.) The ALJ found that Kestner met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2008. (R. at 14.) The ALJ also found that Kestner had not engaged in substantial gainful activity since December 31, 2003, the alleged onset date. (R. at 14.) The ALJ determined that the medical evidence established that Kestner suffered from severe impairments, including essential hypertension, osteoarthritis and pain in the right shoulder, back and leg. (R. at 14.) However, the ALJ concluded that Kestner did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ

found that Kestner had the residual functional capacity to perform sedentary work.[1] (R. at 21.) Specifically, the ALJ found that Kestner could lift and/or carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently, that he could sit and/or walk for a total of six hours in an eight-hour workday, but that he could sit and/or walk for only one hour without interruption and could stand for only 30 minutes without interruption, that he could occasionally reach overhead, frequently reach in all other directions, handle, finger and feel objects and push and pull, that he could never operate foot controls, that he could occasionally climb stairs and ramps, balance, stoop, kneel and crouch, that he could never climb ladders or scaffolds or crawl, that he could frequently tolerate exposure to humidity and wetness and extreme temperatures, that he could occasionally tolerate exposure to moving mechanical parts and operate a motor vehicle, that he should never be exposed to unprotected heights, dust, odors, fumes and pulmonary irritants and vibrations and that he could tolerate loud noise. (R. at 21.) The ALJ also found that Kestner's concentration, persistence and pace were mildly reduced. (R. at 21.) Therefore, the ALJ found that Kestner was unable to perform his past relevant work as a construction worker, a wood products assembler, a tire builder and a trailer parts assembler. (R. at 24.) Based on Kestner's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Kestner could perform, including jobs as a product grader and sorter,

---

[1]Sedentary work involves lifting items weighing up to 10 pounds at a time with frequent lifting or carrying of items such as docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2010).

a product packager and a machine operator and tender. (R. at 25.) Thus, the ALJ found that Kestner was not under a disability as defined under the Act and was not eligible for benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2010).

After the ALJ issued his decision, Kestner pursued his administrative appeals, (R. at 27-28), but the Appeals Council denied his request for review. (R. at 1-5.) Kestner then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2010). The case is before this court on Kestner's motion for summary judgment filed September 14, 2010, and the Commissioner's motion for summary judgment filed October 14, 2010.

## II. Facts

Kestner was born in 1967, (R. at 33, 100, 106, 123), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He completed the eighth grade,[2] but attended some special education classes. (R. at 34.) Kestner has past work experience as a factory worker and a construction worker. (R. at 31.)

Kestner testified that he was able to prepare his own meals and washed dishes once weekly. (R. at 35, 46.) He also stated that he was able to grocery shop, but that someone had to carry his groceries inside for him. (R. at 35, 48.) He stated

---

[2]Because Kestner completed only the eighth grade, he has a "limited education," defined in the regulations as having an ability in reasoning, arithmetic and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semiskilled or skilled jobs. An individual with a seventh-grade through eleventh-grade level of formal education is deemed to have a limited education. *See* 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3) (2010).

that he watched television and went outside to walk around some, but not for long distances. (R. at 36.) Kestner testified that he had difficulty bending and that it took him longer to shower and dress himself than previously. (R. at 47.) Kestner testified that he did not get out much and that he had difficulty sleeping due to pain. (R. at 35-36.) He stated that he had to lie down approximately three times daily, for a total of about six hours. (R. at 36.) Kestner testified that he stopped working in December 2003 when his back pain prevented him from getting out of bed. (R. at 37.) He described his back pain as being located from the mid- to lower back and radiating into the legs, mostly the left. (R. at 39-40.) He stated that he experienced this back pain daily, but not constantly. (R. at 39.) Kestner testified that he experienced cramping and spasms when sitting too long, but stated that he also could not stand for too long. (R. at 39.) Kestner also testified that his knees sometimes felt as if they would give way. (R. at 40-41.) He testified that he had been advised to take up to three Tylenol daily for his back pain and that he used a prescribed back brace, which helped. (R. at 40, 44-45.) Kestner estimated that he could sit for one hour without interruption, but could stand for only 15 minutes without interruption. (R. at 48-49.) He testified that he had previously taken tramadol and Skelaxin for his back pain, but stopped due to a fear of addiction, noting a history of alcohol abuse. (R. at 43.) However, he testified that he had not consumed any alcoholic beverages for approximately three months. (R. at 43-44.) He testified that neither surgery nor an orthopaedic evaluation had been recommended for his back pain. (R. at 45.)

Kestner also testified that he suffered from tennis elbow, for which he had received injections. (R. at 41, 48.) He stated that he had undergone right shoulder surgery in 2003, which had helped initially, but that the same symptoms were

beginning to return. (R. at 41, 45-46.) Kestner, who is right-hand dominant, stated that he had difficulty reaching overhead with his right arm. (R. at 41, 46.) He further testified that he experienced "real bad" headaches approximately two to three times weekly, lasting three to four hours each and requiring him to take aspirin and lie down. (R. at 41, 49.) Kestner noted that these headaches began approximately two years previously. (R. at 49.) He testified that he also experienced shortness of breath, noting that he smoked. (R. at 42.) Kestner further stated that he took blood pressure medication and that his neck would sometimes pop when turning to the right. (R. at 42.) Kestner further testified that he had suffered from depression due to his inability to work. (R. at 42.) However, he stated that he had not suffered any depression or anxiety for approximately nine months. (R. at 49.)

Lea P. Salyers, a vocational expert, also was present and testified at Kestner's hearing. (R. at 50-54.) Salyers classified Kestner's work as a construction worker, a tire builder and a trailer parts assembler as heavy[3] to very heavy[4] and semiskilled, and she classified his work as a wood products assembler as medium[5] and semiskilled. (R. at 50-51.) She stated that none of Kestner's skills

---

[3] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2010).

[4] Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of items weighing 50 pounds or more. If someone can do very heavy work, he also can do heavy, medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(e), 416.967(e) (2010).

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2010).

would be transferable to light[6] or sedentary work. (R. at 51.) Salyers testified that a hypothetical individual of Kestner's age, education and work history, who was limited as set forth in the residual functional capacity assessment completed by Dr. William Humphries, M.D., who experienced pain in the back, legs, elbow, knee, shoulder and elsewhere, who took medication that made him drowsy or dizzy, who experienced headaches up to four times weekly, who was fatigued due to poor sleep, who had shortness of breath and continued to smoke and who suffered from depression, with some good days and some bad days, but whose concentration, persistence and pace were only mildly reduced, would not be able to perform any of Kestner's past relevant work, but could perform jobs existing in significant numbers in the national economy, including those of a product grader and sorter, a product packager and a machine operator and tender, all at the sedentary level of exertion. (R. at 51-52.) Salyers next testified that the same hypothetical individual, but who had a moderate reduction in concentration, persistence or pace, could perform the same jobs. (R. at 53.) Salyers testified that the same hypothetical individual, but who had a severe reduction in concentration, persistence and pace, could not perform any jobs. (R. at 53.) She testified that the same hypothetical individual, but who needed to rest two to three hours during the workday, also could perform no jobs. (R. at 53.) Finally, Salyers testified that the same hypothetical individual, but who experienced headaches that caused him to miss work two or more days monthly, could not perform any jobs. (R. at 53-54.)

---

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2010).

In rendering his decision, the ALJ reviewed records from Wythe County Community Hospital; West Ridge Orthopaedic Specialists; Dr. Robert Hale, M.D.; Dr. Paul N. Morin, M.D.; Saltville Medical Center; Richard J. Milan Jr., Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; Dr. William H. Humphries, M.D.; Smyth County Community Hospital; and Sally T. Pennings, F.N.P. Kestner's attorney submitted additional medical records from Angelia Berry, Psy.D., a licensed clinical psychologist; and Saltville Medical Center to the Appeals Council.[7]

On July 24, 2003, prior to Kestner's alleged onset date, he underwent surgical repair of the right rotator cuff and a subacromial decompression by Dr. Paul Morin, M.D. (R. at 225.) Kestner's post-surgical course was uncomplicated. He was initially restricted in his abilities to lift and to push and/or pull, but on October 27, 2003, he was released by Dr. Morin to return to work. (R. at 236.) On October 13, 2003, Dr. Morin administered bilateral elbow injections based on Kestner's complaints of pain. (R. at 236.)

On November 20, 2003, Kestner saw Dr. Robert Hale, M.D., with complaints of twisting his back and possibly pulling a muscle, but he reported that his shoulder was better. (R. at 252.) He was diagnosed with a low back strain, gastroesophageal reflux disease, ("GERD"), anxiety and nicotine addiction, and

---

[7] Because the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-5), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991.)

Dr. Hale prescribed Nexium, Xanax and Vicodin.  (R. at 252.)  Kestner again saw Dr. Hale on June 1, 2004, at which time he reported being in a motor vehicle accident on April 1, 2004.[8]  (R. at 252.)  On August 9, 2004, November 4, 2004, and again on January 31, 2005, Kestner's diagnoses and medications remained essentially unchanged.  (R. at 248, 251.)  On March 15, 2005, Kestner presented to Saltville Medical Center, ("Saltville"), requesting medication for "nerves."  (R. at 272.)  He noted that he had been unemployed for nine months and was having difficulty sleeping.  (R. at 272.)  Kestner denied then-current alcohol use, but appeared shaky.  (R. at 272.)  He appeared "somewhat disheveled" and had a fine tremor, but he had a normal mental status.  (R. at 272.)  Kestner was diagnosed with insomnia and a history of alcohol abuse, and he was prescribed Elavil.  (R. at 272.)  On April 18, 2005, Kestner complained of low back pain that radiated into the left leg.  (R. at 248.)  Dr. Hale diagnosed low back strain, and he prescribed Ultram.  (R. at 248.)  On July 18, 2005, Kestner continued to complain of back pain that radiated into his left hip and leg, but noted that it was getting "some better." (R. at 247.) Deep tendon reflexes were within normal limits, and Kestner's diagnoses and medications remained essentially unchanged through July 18, 2006. (R. at 245-47.)

Kestner was seen in the emergency department at Smyth County Community Hospital, ("Smyth County"), on July 16, 2005, with complaints of right rib pain with difficulty breathing after wrestling with a friend three days previously.  (R. at 240-41.)  He was diagnosed with a right rib contusion and was discharged in stable condition with a prescription for Lortab.  (R. at 238-39.)

---

[8] There are no medical records reflecting treatment received for this accident contained in the record.

On January 29, 2007, Kestner returned to Saltville with complaints of hypertension. (R. at 270.) He noted a racing heart with occasional associated headache. (R. at 270.) He admitted drinking more than a six-pack of alcohol per day, which he was using to treat anxiety and depression. (R. at 270.) Kestner stated that he had taken Xanax previously to help calm him down and to help with his blood pressure and headaches, noting that it also helped control his drinking. (R. at 270.) Kestner smelled of alcohol and had a red face. (R. at 270.) Sally Pennings, F.N.P., diagnosed hypertension, headaches, tachycardia, alcoholism, depression and anxiety, and she prescribed atenolol, Fluoxetine and Atarax. (R. at 270.) Kestner agreed to quit drinking. (R. at 270.) He returned to Saltville on February 7, 2007, with complaints of abdominal pain. (R. at 271.) Pennings diagnosed a history of abdominal pain with past history of peptic ulcer disease, alcoholism and GERD, and she prescribed Zantac. (R. at 271.) On February 28, 2007, Kestner noted that atenolol and Zantac had "really helped his symptoms" of hypertension and stomach pain, but that Prozac did not seem to be working as well. (R. at 269.) Pennings noted a strong odor of alcohol and that Kestner's face and eyes were red. (R. at 269.) She administered an injection to Kestner's left elbow and diagnosed hypertension, GERD, anxiety/depression, obvious continuous alcohol use and lateral epicondylitis of the left elbow. (R. at 269.) Pennings continued atenolol and Zantac and increased Kestner's dosage of Prozac. (R. at 269.)

On April 30, 2007, Kestner continued to drink alcohol, but had cut back from a case per day to 12 beers per day. (R. at 276.) He was not interested in detoxification. (R. at 276.) He reported that his depression was well-controlled, but that he still felt nervous, which he attributed to alcohol abuse. (R. at 276.) Kestner

also continued to smoke. (R. at 276.)  His left elbow was 50-75 percent improved since the previous injection. (R. at 276.) Pennings diagnosed hypertension, depression, insomnia, GERD and alcohol abuse, and she strongly encouraged Kestner to undergo detoxification. (R. at 275.)

On May 8, 2007, Richard J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating Kestner had no severe mental impairment. (R. at 277-90.) Milan opined that Kestner was not restricted in his activities of daily living, had no difficulties maintaining social functioning or maintaining concentration, persistence or pace and had experienced no episodes of decompensation of extended duration. (R. at 287.)  Milan found Kestner's mental allegations only partially credible. (R. at 290.)

The same day, Dr. Richard Surrusco, M.D., a state agency physician, completed a physical assessment, finding that Kestner could perform light work. (R. at 291-97.)  He imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 293-94.) Dr. Surrusco found Kestner's allegations to be only partially credible based on his activities of daily living and Dr. Morin's opinion on October 20, 2003, that Kestner could return to work.  (R. at 296-97.)

Kestner presented to the emergency department at Smyth County on July 18, 2007, with complaints of sharp chest pain with radiation into the back for two days, worsened by coughing, breathing and movement.  (R. at 342-43, 345.)  He smelled of alcohol, and he admitted to having drunk six beers.  (R. at 343, 345.) Kestner had diminished breath sounds, wheezes and rales.  (R. at 343.)  A chest x-ray showed no acute chest abnormality, but a left lateral perihilar nodule, probably

reflecting a granuloma, was noted. (R. at 346.) An electrocardiogram was normal. (R. at 347.) Admission and treatment were recommended, but Kestner signed out against medical advice. (R. at 348.)

Kestner again saw Pennings on July 25, 2007, with complaints of hypertension, low back pain that radiated into the left leg, left leg numbness and tingling down to the toes, left leg weakness and leg cramps. (R. at 354-55.) He reported that standing caused back pain, but he stated that he could use a weedeater or mow for one hour at a time. (R. at 354.) He rated his back pain as a seven on a 10-point scale. (R. at 354.) Physical examination showed mild, bilateral sacroiliac, ("SI"), joint tenderness, but negative straight leg raise testing, normal sensation of the bilateral lower extremities and a normal gait. (R. at 354-55.) Pennings diagnosed hypertension and back pain, and she continued Kestner on medications. (R. at 355.) On October 1, 2007, Kestner complained of right-sided back pain with radiation into the right leg after hurting it while weedeating approximately four weeks previously. (R. at 352.) Kestner appeared to be under the influence of alcohol, but he was alert and oriented and in no acute distress. (R. at 352.) He exhibited tenderness over the lower spine region, but straight leg raise testing was negative bilaterally, he had no decrease in range of motion or deep tendon reflexes, no foot drop, and he ambulated well without problems. (R. at 352.) Pennings diagnosed lumbago and sciatica, for which she prescribed tramadol and Skelaxin. (R. at 352-53.)

Dr. Robert McGuffin, M.D., a state agency physician, completed a physical assessment on September 26, 2007, finding that Kestner could perform light work. (R. at 298-304.) He imposed no postural, manipulative, visual, communicative or

environmental limitations. (R. at 300-01.) Dr. McGuffin found Kestner's subjective allegations to be only partially credible. (R. at 303.)

On April 16, 2008, Kestner saw Dr. William Humphries, M.D., for an evaluation of low back pain, at the request of Disability Determination Services. (R. at 318-22.) He reported pain most of the time in the low back region, worse in the supine position, with sleeping and with bending or picking up objects. (R. at 318.) He denied loss of extremity control and opined that he could walk a mile on a good day on level ground without stopping. (R. at 318.) Kestner stated that he wore a back brace and had undergone low back injections a year previously.[9] (R. at 318.) Kestner was alert, pleasant and in no acute distress. (R. at 319.)

Although Kestner reported discomfort in the cervical spine region on range of motion, it was within normal limits with no specific tenderness. (R. at 319.) Range of motion of the back was mildly reduced with mild dorsal kyphosis, no scoliosis and no paravertebral muscle spasm. (R. at 319.) There was diffuse tenderness to palpation of the paraspinous muscles of the thoracic and lumbar region, and straight leg raise testing was positive on the left at 80 degrees for knee pain and positive on the right at 80 degrees for lumbar discomfort. (R. at 319.) Joint range of motion of the upper extremities was full in both shoulders and wrists, and the elbow range of motion was within normal limits with some tenderness to palpation of both radial heads. (R. at 319.) Some mild tenderness to palpation of the right anterior shoulder girdle was noted, as was some mild synovial thickening of some of the metacarpophalangeal, ("MCP"), and

---

[9] No medical records reflecting such low back injections are contained in the record.

interphalangeal, ("IP"), joints of the fingers of both hands. (R. at 320.) Lower extremity joint range of motion was slightly reduced in both hips due to lumbar discomfort, but was within normal limits in both knees and ankles. (R. at 320.) Mild tenderness to palpation of the knees and ankle regions without excess heat or significant deformity was noted. (R. at 320.) Some mild synovial thickening of some of the metatarsaphalangeal, ("MTP"), and IP joints of some of the toes of both feet also was noted. (R. at 320.) Kestner was able to get on and off of the examination table without difficulty, but guarded his back movement and used his hands. (R. at 320.)

Kestner had full grip strength bilaterally, and radial, median and ulnar nerve functions were intact bilaterally. (R. at 320.) Finger-nose testing was adequate, and no tremors or involuntary movements were noted. (R. at 320.) Romberg's sign[10] was borderline positive, as he "waddle[d] a lot, open[ed] his eyes and [was] unable to complete this test." (R. at 320.) Fine manipulations were performed adequately bilaterally, and Kestner's gait was mildly antalgic on the right due to low back and gluteal discomfort. (R. at 320.) Tandem gait was performed in a borderline fashion with several miscues, but Kestner could bear weight on both legs. (R. at 320.) Strength was slightly reduced in all extremities due to symmetrically diminished muscle mass. (R. at 320.) Deep tendon reflexes were trace to 1+ and equal in the biceps, triceps and brachioradialis, and they were 1+ and equal in the knees, but absent in the ankles. (R. at 320.) No specific motor or sensory loss of the lower extremities was noted. (R. at 320.) No significant venous stasis changes of the

---

[10]Romberg's sign is a swaying of the body or falling when standing with the feet close together and the eyes closed. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1525 (27th ed. 1988).

lower extremities were noted, and dorsalis pedis pulses were 1+ on the right and thready on the left. (R. at 321.) Posterior tibials were 1+ and equal, and foot perfusion was adequate bilaterally. (R. at 321.)

Dr. Humphries diagnosed hypertension; chronic lumbar strain, post-traumatic, with possible degenerative joint disease, degenerative disc disease and mild peripheral neuropathy in both lower extremities; mild chronic obstructive pulmonary disease, ("COPD"); mild degenerative joint disease of both hands and feet; ongoing shoulder discomfort, secondary to either rotator cuff injury or impingement syndrome; and recurrent, bilateral tennis elbow. (R. at 321.)

Dr. Humphries also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical), finding that Kestner could frequently lift items weighing up to 10 pounds, occasionally lift and/or carry items weighing up to 20 pounds and never lift and/or carry items weighing more than 20 pounds. (R. at 323-28.) He further found that Kestner could sit, stand and/or walk for a total of six hours in an eight-hour workday, but could sit and/or walk for up to only one hour at a time and could stand for up to only 30 minutes at a time. (R. at 324.) Dr. Humphries opined that Kestner could occasionally reach overhead, but could frequently reach in all other directions, handle, finger and feel objects and push and pull. (R. at 325.) He opined that Kestner could never operate foot controls, never climb ladders or scaffolds and never crawl, but could occasionally climb stairs and ramps, balance, stoop, kneel and crouch. (R. at 325-26.) Dr. Humphries further opined that Kestner could never work around unprotected heights, dusts, odors, fumes and pulmonary irritants or vibrations, could occasionally work around moving mechanical parts and operate a motor vehicle and frequently work around

humidity and wetness and temperature extremes and could work around loud noise. (R. at 327.) Finally, Dr. Humphries opined that Kestner could not walk a block at a reasonable pace on rough or uneven surfaces, but could shop, travel without a companion for assistance, ambulate without using a wheelchair, walker or two canes or two crutches, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed himself, care for personal hygiene and sort, handle and use paper/files. (R. at 328.)

On May 12, 2008, Kestner appeared to be in no acute distress, was alert and oriented. (R. at 350, 373.) Pennings diagnosed hypertension, anxiety disorder, not otherwise specified, major depression, not otherwise specified, and GERD, and she prescribed Toprol, Nexium and Zoloft. (R. at 351, 373.) On September 23, 2008, Kestner complained of bilateral shoulder pain and elbow pain, which he rated as a 10. (R. at 371.) He denied the use of alcohol at that time. (R. at 371.) Kestner appeared to be in no acute distress, and he was alert and oriented. (R. at 371.) Pennings diagnosed bursitis, not otherwise specified. (R. at 371.) On November 5, 2008, Kestner complained of arm pain, left shoulder pain and bilateral elbow pain, which he rated as an eight. (R. at 369.) He reported that the shoulder pain began approximately two weeks previously, that Tylenol was not helping and that a previous injection had not helped. (R. at 369.) Kestner again denied the use of alcohol. (R. at 369.) Dr. Paul D. Williams, M.D., at Saltville, noted that Kestner was well-appearing, well-developed and in no acute distress. (R. at 369.) Physical examination showed tenderness over both lateral epicondyles and diffuse tenderness over the shoulder. (R. at 369.) Dr. Williams diagnosed lateral

eipcondylitis and shoulder pain, and he prescribed Naprosyn and recommended an elbow strap. (R. at 369-70.)

Kestner saw Angelia Berry, Psy.D., a licensed clinical psychologist, for a consultative psychological evaluation, on December 4, 2008. (R. at 357-60.) Kestner denied a history of psychiatric hospitalizations or outpatient counseling. (R. at 358.) He denied sadness, worry, crying, hopelessness, anxiety, depression, panic, mania, hallucinations or suicidal/homicidal ideation, intent or plan. (R. at 358.) Kestner stated that he was "not sure" why he was prescribed medications for anxiety and depression, noting that he initially had problems "adjusting" when he lost his job in 2003, but noting that he currently had "no problems." (R. at 358.) He indicated that he last consumed alcohol six months previously and, prior to that time, he consumed 12 beers daily for approximately two years. (R. at 358.) Kestner stated that he quit school in the eighth grade at age 17, noting that he failed the first and fourth grades. (R. at 358.) He noted special education placement in spelling, but regular classes in all other subjects. (R. at 358.)

Kestner reported the ability to complete self-care tasks independently, but at a slow pace. (R. at 359.) He reported that he was capable of managing his finances independently, and he stated that he spent his time watching television, walking outside and occasionally visiting with friends. (R. at 359.) However, he stated that he did not often ride in a car due to back pain. (R. at 359.)

Kestner was oriented, had normal motor activity and had coherent and logical thought content, but a slightly below average fund of information. (R. at 359.) Short- and long-term memory were normal, but working memory was mildly

impaired. (R. at 359.) His judgment and insight were deemed mildly impaired, but adequate. (R. at 359.) Kestner indicated that his mood was "good," and his affect appeared euthymic. (R. at 359.) His motivation to perform well on the mental status examination tasks was apparent and, overall, Berry found Kestner's self-report to be reliable. (R. at 359.) Berry concluded that Kestner did not meet the criteria for mental health diagnoses per his self-report. (R. at 359.) She assessed his then-current Global Assessment of Functioning, ("GAF"),[11] score at 75,[12] and she opined that he was capable of managing his financial resources. (R. at 360.)

Berry also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), finding that Kestner was not limited in his ability to understand, remember and carry out simple instructions, to make judgments on simple work-related decisions and to carry out complex instructions. (R. at 361-63.) She found that he was only mildly limited in his ability to understand and remember complex instructions and to make judgments on complex work-related decisions. (R. at 361.) She found that his ability to interact appropriately with supervision, co-workers and the public, as well as to respond to changes in a routine work setting, were not affected by his impairments. (R. at 362.)

_____

[11]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[12] A GAF score of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors . . .; no more than slight impairment in social, occupational, or school functioning. . . ." DSM-IV at 32.

On February 13, 2009, Kestner saw Dr. G. David Dyer, M.D., at Saltville, with complaints of a left occipital headache and shoulder pain. (R. at 367.) He had no focal neurological deficits and was alert, oriented and in no acute distress. (R. at 367.) Kestner again denied alcohol use. (R. at 367.) A CT scan of the head showed only sinusitis. (R. at 367, 375, 398.) Dr. Dyer diagnosed headache. (R. at 367.)

On April 29, 2009, Kestner again saw Pennings with complaints of headaches, a burning shoulder pain and back pain radiating into the left leg, and he requested something for his "nerves." (R. at 380-82.) He rated his pain as an eight. (R. at 380.) He reported quitting drinking alcohol "cold turkey" eight months previously, and he noted that his anxiety had decreased. (R. at 380.) Kestner had good range of motion in the right shoulder, but no strength in the left arm with some tingling at times depending on positioning. (R. at 380.) He stated that the back pain radiated into the left leg to the toes and that he had a burning pain in the center of the thigh. (R. at 380.) He noted that movement helped some, as well as lying on his left side. (R. at 380.) Kestner reported limping at times and feeling like his leg would give way. (R. at 380.) Pennings diagnosed headache, hypertension, GERD, anxiety disorder, not otherwise specified, and continuous alcohol abuse. (R. at 380-81.) She prescribed Inderal and Robaxin, sodium tablet and amoxicillin. (R. at 381.)

An MRI of the lumbar spine, performed on May 1, 2009, showed a probable benign vascular tumor in L4 and Modic-type endplate changes at L5-S1. (R. at 390.) There also was grade II anterolisthesis of L5 on S1, which appeared a little worse than it appeared on x-rays from 2007. (R. at 390.) Kestner also had bilateral pars interarticularis defects at L5, as well as small ventral extradural defects at

multiple levels, including T11-T12, L3-L4 and L5-S1. (R. at 390.) Severe foraminal encroachment from disc material and spondylolisthesis at L5-S1, worse on the left, also was noted. (R. at 390.) Mild concentric disc bulge with no significant canal stenosis or foraminal narrowing was noted at the L3-L4 level. (R. at 390.) X-rays of the lumbar spine likewise showed mild lumbar spondylosis, bilateral L5 pars interarticularis defects and a grade II spondylolisthesis of L5 on S1, an apparent L5-S1 vacuum disc phenomenon and advanced L5-S1 disc space narrowing with likely complete desiccation of the L5-S1 disc. (R. at 396.) An MRI of the cervical spine showed no acute osseous abnormalities and no spinal stenosis or significant asymmetric focalized herniated nucleus pulposus, but there were degenerative changes slightly more pronounced at the C6-C7 disc space level. (R. at 393.) X-rays of the cervical spine were normal, and a CT scan of the head showed only sinusitis. (R. at 397-98.) An MRI of the left shoulder showed some focal increased T2 signal in the mid supraspinatus tendon, but no frank tear was demonstrated. (R. at 392.) There was a borderline axillary node, the acromion was near horizontal with minimal subacromial clearance, there were some small degenerative geode-like lesions at the greater tuberosity, there was a little bit of fluid along the long head of the biceps tendon with no frank tear and there may have been a small amount of fluid in the subcoracoid bursa. (R. at 392.)

On June 1, 2009, Kestner complained of continued lower back pain with little improvement. (R. at 378.) He indicated his willingness to obtain a neurosurgical evaluation given the MRI findings. (R. at 378.) Kestner reported improvement in chronic headaches since antibiotic treatment for sinusitis. (R. at 378.) He further reported left shoulder pain and stiffness upon awakening. (R. at 378.) Physical examination showed decreased SI joint mobility bilaterally, mild

tenderness in the lumbar region to palpation and ambulation without limp. (R. at 378.) Kestner was able to heel and toe stand well, but sensation in the left leg was decreased following L5-S1 dermatome. (R. at 378.) Pennings diagnosed hyperthymism,[13] Kestner was instructed to begin Voltaren, and he was referred to the University of Virginia for a neurosurgical evaluation of his low back pain. (R. at 378-79.)

On July 1, 2009, Kestner saw Lisa Foster, P.A.C., a physician's assistant, at the University of Virginia Department of Neurological Surgery, ("U.Va."). (R. at 388-89.) Kestner was in no acute distress, but his lumbar spine was tender to palpation. (R. at 388.) There was no evidence of paraspinous muscle spasm, and his extremities were nontender and without clubbing, cyanosis or edema. (R. at 388.) Kestner's strength was 5/5, except for some mild weakness in the right foot and left hamstrings. (R. at 388.) Sensation was intact, and deep tendon reflexes were 1-2+ and symmetric. (R. at 388.) Kestner had a normal gait, and there was no evidence of pathologic reflexes. (R. at 388.) Foster noted the recent MRI findings of L5-S1 grade II spondylolisthesis and evidence of bilateral L5 interarticularis defects. (R. at 388.) She noted that Kestner had significant evidence of lumbar radiculopathy related to L5-S1 grade II spondylolisthesis. (R. at 388.) She prescribed gabapentin and Ultram, and she noted that she would review Kestner's films with Dr. Mark Shaffrey, M.D., for evaluation and possible surgical intervention. (R. at 388.)

---

[13] Hyperthymism is a condition attributed to excessive activity of the thymus gland. *See* Dorland's at 800.

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2010).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2010); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Kestner argues that the ALJ erred by failing to find that his impairments, in combination with disabling pain, precluded him from working. (Plaintiff's Brief In

Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-14.) Kestner also argues that this court should remand the case to the Commissioner based on additional evidence submitted to the Appeals Council. (Plaintiff's Brief at 14-15.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Kestner first argues that the ALJ erred by failing to find that his impairments, in combination with disabling pain, preclude him from working. (Plaintiff's Brief at 8-14.) For the reasons that follow, I find that the ALJ's pain analysis was proper and that substantial evidence supports the ALJ's finding that Kestner can perform sedentary work existing in significant numbers in the national economy.

The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers. . . .

76 F.3d at 595.  In *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989), the Fourth Circuit stated that "[p]ain itself can be disabling, and it is incumbent upon the ALJ to evaluate the effect of pain on a claimant's ability to function."  Evidence of a claimant's activities as affected by pain is relevant to the severity of the impairment.  *See Craig*, 76 F.3d at 595.

Furthermore, an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record.  *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).  "[S]ubjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof." *Parris v. Heckler*, 733 F.2d 324, 327 (4th Cir. 1984).  As in the case of other factual questions, credibility determinations as to a claimant's testimony regarding his pain are for the ALJ to make.  *See Shively*, 739 F.2d at 989-90 (affirming ALJ's decision to discredit claimant's testimony as to pain that was out of proportion with objective evidence because the court was persuaded the ALJ considered the testimony).  To hold that an ALJ may not consider the relationship between the objective evidence and the claimant's subjective testimony as to pain would unreasonably restrict the ALJ's ability to meaningfully assess a claimant's testimony.

Here, the ALJ stated as follows: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 22.) The ALJ then proceeded to

explain in detail the bases for this finding. (R. at 22.) For the following reasons, I find that the ALJ's finding is supported by substantial evidence.

First, as the ALJ noted, Kestner's treatment had been conservative in nature. (R. at 22.) He has been prescribed medications, has received injections in his elbows and has been prescribed a back brace.[14] Physical therapy has not been prescribed, Kestner has not been referred to an orthopaedic specialist, nor has surgical intervention been recommended. Also, there is evidence that the medications prescribed have helped Kestner's conditions. For instance, at his hearing, Kestner testified that his back brace helped. (R. at 40.) He noted that his "real bad" headaches were helped with aspirin and lying down. (R. at 49.) In January 2007, Kestner reported that Xanax had helped control his blood pressure and headaches. (R. at 270.) In February 2007, he reported that atenolol and Zantac "really helped his symptoms" of hypertension and stomach pain. (R. at 269.) In April 2007, Kestner reported a 50-75 percent improvement in his left elbow after receiving an injection. (R. at 276.) It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ's finding is further supported by relatively benign findings on physical examinations, including the following: mild SI joint tenderness, tenderness over the lower spine region, normal sensation, no decrease in deep tendon reflexes, no foot drop, no tenderness of the cervical spine, mildly reduced back range of motion with mild dorsal kyphosis, no scoliosis, no paravertebral

---

[14] I note that while Kestner testified at his hearing that this back brace is doctor-prescribed, evidence of such prescription is not contained in the medical records before the court.

muscle spasm, diffuse tenderness to palpation of the paraspinous muscles of the thoracic and lumbar regions, positive straight leg raise testing on the left at 80 degrees for knee pain and positive on the right at 80 degrees for lumbar discomfort, full joint range of motion of the upper extremities, some tenderness to palpation of both radial heads of the elbows, some mild tenderness to palpation of the right anterior shoulder girdle, some mild synovial thickening of some of the MCP joints of the fingers of both hands, slightly reduced range of motion of both hips due to lumbar discomfort, mild tenderness to palpation of the knee and ankle regions, some mild synovial thickening of the MTP and IP joints of some of the toes of both feet, full grip strength bilaterally, intact radial, median and ulnar nerve functioning bilaterally, adequate finger-nose testing, borderline positive Romberg's sign, adequate bilateral fine manipulation, mildly antalgic gait on the right due to low back and gluteal discomfort, weight bearing ability on both legs, borderline tandem gait, slightly reduced strength in all extremities due to symmetrically diminished muscle mass and no specific motor or sensory loss of the lower extremities. (R. at 319-20, 352, 354-55.)

Additional support for the ALJ's finding is found in the opinion of Dr. Morin, who performed Kestner's shoulder surgery, and who indicated in October 2003, that he retained the ability to work. (R. at 236.) Moreover, Dr. Humphries opined that Kestner could perform sedentary work, while Dr. Surrusco and Dr. McGuffin, state agency physicians, opined that he could perform light work. (R. at 291-304, 323-28.) Moreover, although Kestner complained of rather severe pain during several of his medical visits, it was consistently noted that he was in no acute distress. (R. at 319, 352, 367, 369, 371, 373.) He also was able to attend numerous medical appointments, one as far away as Charlottesville, Virginia.

Furthermore, I note that that Kestner has made statements to various healthcare providers that belie any contention that he suffers from disabling pain. For instance, in July 2006, he informed health care providers at Smyth County that he injured his ribs while wrestling with a friend, and in July 2007, he stated that he could weedeat and mow his yard for one hour without interruption. (R. at 240-41, 354.) I find such statements inconsistent with Kestner's allegation that he suffers from disabling pain and that he can perform no work activity.  Even in his most recent Function Report, dated August 20, 2007, Kestner reported that he could perform personal care at a slowed pace, that he prepared his own meals daily, that he could mow a little bit at a time, that he could do laundry, that he went outside almost every day, that he could go out alone, that he could grocery shop for approximately 30 minutes twice monthly, that he watched television and sometimes fished, that he talked with others daily and that he could walk 100 feet before having to rest for five minutes. (R. at 183-87.) Kestner further reported that he used a brace daily, but that it was not doctor-prescribed. (R. at 188.)

It is for all of the above-stated reasons that I find that substantial evidence supports the ALJ's pain analysis and his finding that Kestner could work despite his impairments.

Kestner also argues that this court should remand the case to the Commissioner pursuant to sentence six of 42 U.S.C. § 405(g).  Section 405(g) states that "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to

incorporate such evidence into the record in a prior proceeding." 42 U.S.C.A. § 405(g) (West 2003 & Supp. 2010.)

For additional evidence to merit remand pursuant to sentence six, it must be new and material, and Kestner must present good cause for his failure to incorporate the evidence in the record of the prior proceeding. *See* 42 U.S.C. § 405(g); *see also Wilkins*, 953 F.2d at 96; *Arthur v. Barnhart*, 211 F. Supp. 2d 783, 787-88 (W.D. Va. 2002). Evidence is new if it is not duplicative or cumulative, and it is material if it creates a reasonable possibility that it would have changed the outcome. *See Wilkins*, 953 F.2d at 96. Based on my review of the record in this case, Kestner's motion to remand pursuant to sentence six is inappropriate. Kestner does not seek remand for consideration of "new" evidence as required by sentence six of § 405(g). The evidence Kestner cites is evidence that was presented to, and considered by, the Appeals Council. That being the case, as stated above, the court must determine whether substantial evidence supports the Commissioner's decision considering the record in its entirety, including the evidence presented to the Appeals Council. *See Wilkins*, 953 F.2d at 96.

The ALJ found that Kestner retained the functional capacity to perform sedentary work, and the vocational expert found that a significant number of jobs existed in the national economy that Kestner could perform. (R. at 21.) I find that substantial evidence supports the ALJ's finding that Kestner could perform such work. Specifically, while the evidence of record shows that Kestner suffers from hypertension, back and leg pain, shoulder pain and lateral epicondylitis, no treating provider has imposed any restrictions on Kestner's work-related abilities. Additionally, physical examinations have been fairly unremarkable, the state

agency physicians found that Kestner could perform light work, Dr. Humphries found that he could perform sedentary work, Kestner has undergone essentially conservative treatment for his impairments, which have helped them, and Kestner's reported activities are inconsistent with a total inability to work, all as set forth above. I find that nothing contained in the evidence submitted to the Appeals Council would allow this court to find that the ALJ's finding that Kestner is not disabled is not supported by substantial evidence.

While the evidence presented to the Appeals Council shows some progression of Kestner's back impairment, no additional restrictions were imposed on Kestner's work-related abilities. Also, while the treatment note from U.Va. references awaiting an opinion from Dr. Shaffrey regarding the possibility of surgical intervention, no such opinion was presented to the Appeals Council or this court. I further note that, on physical examination at U.Va. on July 1, 2009, Kestner had tenderness to palpation of the lumbar spine, but no paraspinous muscle spasm was noted, and his strength was 5/5 except for some mild weakness in the right foot and left hamstring. (R. at 388.) His sensation was intact, deep tendon reflexes were 1-2+ and symmetric, his gait was normal, and there was no evidence of pathologic reflexes. (R. at 388.) Lisa Foster, a physician's assistant, placed no restrictions on Kestner. All of this being the case, I find that the ALJ's residual functional capacity finding and his finding that Kestner could perform work existing in significant numbers in the national economy are supported by substantial evidence, even given this additional medical evidence presented to the Appeals Council.

# PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the Commissioner's pain analysis;

2. Substantial evidence exists to support the Commissioner's physical residual functional capacity finding; and

3. Substantial evidence exists to support the Commissioner's finding that Kestner was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Kestner's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo

determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     January 26, 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE